**HERCULES INCORPORATED, a Corporation of the State of Delaware, Plaintiff,**

v.

**AIG AVIATION, INC., et al., Defendants.**

**C.A. No. 98C–05–124–FSS.**

Superior Court of Delaware.

Submitted: June 18, 1999.
Decided: Jan. 7, 2000 **.

---

** Hard copy issued 3/2/00

W. Harding Drane (Potter, Anderson & Corroon, LLP), Richard E. Poole, Wilmington, for Plaintiff Hercules Inc.

Anthony G. Flynn, Timothy Jay Houseal (Young, Conaway, Stargatt & Taylor), Wilimington, Ralph G. Wellington, Nancy Winkelman, Philadelphia, Jonathan M. Stern, Washington, DC, Schnader, Harrison, Segal & Lewis, LLP, for Defendant.

Francis J. Murphy, John S. Spadaro (Murphy Spadaro & Landon), Wilmington, John G. McAndrews, Dean J. Vigliano, and Mathew G. Dineen, Mendes & Mount, LLP, for Defendants London Market Insurer's.

## OPINION AND ORDER

SILVERMAN, Judge.

This is an insurance coverage case. Hercules demands millions that it paid to settle a suit under the federal False Claims Act.[1] In broad terms, the federal litigation concerned Hercules allegedly billing and misbilling the United States for substandard aerospace products delivered under various contracts in the 1980s.

1. 31 U.S.C. § 3729 et seq.

Hercules' insurers have moved for dismissal or summary judgment on alternative grounds. First, the insurers contend that the federal litigation involved uninsured fraud against the United States, as opposed to the insured occurrence of property damage. Similarly, some insurers contend that even if an occurrence of property damage somehow were involved in the federal action, the property damage was not accidental; it was caused by Hercules' intentional conduct, which also is not covered. The insurers emphasize the fact that Hercules' federal settlement agreement excludes property damage claims. Finally, the insurers argue that Hercules failed to notify them immediately about the federal lawsuit, which notification was a condition precedent to coverage.

Hercules concedes almost nothing. It disavows its federal settlement and recasts what happened in the federal litigation. Hercules offers assorted justifications for coverage. For example, Hercules insists that its personal injury and property insurance also covers civil penalties for fraud. It further contends that its federal settlement actually concerned property damage caused by exploding missiles or rocket motors rather than what Hercules was accused of, fraud. Similarly, Hercules argues that the federal False Claims Act complaint involved contractual misrepresentations or breach of warranty, which Hercules insists are covered by its personal injury and property insurance. And so on. Hercules also asks for its defense costs in the federal case.

As to timely notice, again Hercules concedes almost nothing. Hercules contends that although the federal case was in court for nine years, although it was contractually bound to notify its insures immediately if sued and although it was spending millions on its defense, nevertheless it was reasonable for Hercules to wait until it had worked out a multi-million dollar settlement before notifying its insurers about the suit and its settlement. And besides, the insurers have not established prejudice as a matter of law.

To survive the insurers' dispositive motions, Hercules has submitted affidavits that are chock full of factual allegations. In addition to offering selected rulings by the federal court in the underlying litigation, which are undisputed and which speak for themselves, Hercules presents expert opinions and its trial counsel's impressions about what happened in the federal litigation. Hercules' trial counsel insists that Hercules' federal settlement was for claims covered by insurance. For various reasons, Hercules insists that the Court is bound by Hercules' characterizations of its federal settlement, or at least they get Hercules past the insurers' dispositive motions.

## I.

The litigation in Delaware has proceeded like an insurance coverage case involving many litigants and a lot of money. In other words, despite its youth the case already is procedurally complicated. Specifically, on May 13, 1998, Hercules filed its initial complaint. On June 30, 1998, Certain Defendants filed a Motion to Dismiss, or, in the Alternative, to Stay. Hercules filed its First Amended Complaint for Declaratory Judgment on September 21, 1998. London Market Insurers filed its Answer, Defenses and Counterclaims on October 1, 1998. On October 5, 1998, Certain Defendants filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment. Hercules replied to London Market Insurers' counterclaims on October 20, 1998. London Market Insurers filed a Motion for Summary Judgment on the Basis of Absence of Property Damage, Absence of an Insurable Occurrence, Ab-

sence of Timely Notice and Other Grounds on December 9, 1998.

Hercules filed an Opening Memorandum in Support of its Motion for Partial Summary Adjudication and Combined Answering Memorandum in Opposition to Defendants' Motions to Dismiss and for Summary Judgment on February 8, 1999. Also on February 8, 1999, Hercules filed the Affidavit of Randy L. Dryer. Certain Defendants filed a Reply Memorandum in Support of Motion to Dismiss, or in the Alternative, for Summary Judgment and Responsive Memorandum in Opposition to Hercules' Motion for Partial Summary Adjudication on April 12, 1999. On the same day, London Market Insurers filed a Reply Memorandum in Support of Their Motion for Summary Judgment and Answering Memorandum of Law in Opposition to Hercules' Motion for Partial Summary Adjudication. Also on April 12, 1999, London Market Insurers filed a Motion to Strike Portions of the Dryer Affidavit. Hercules filed a Combined Reply Memorandum in Support of its Motion for Partial Summary Adjudication and Answering Memorandum in Opposition to London's Motion to Strike on May 5, 1999. On May 7, 1999, Hercules filed a Response to London's Motion to Strike Hercules Reply Memorandum. Oral argument was held on June 18, 1999.

In summary, Hercules filed suit. Defendants moved to dismiss or, in the alternative, for summary judgment. Hercules filed a cross-motion for partial summary judgment. Both sides have filed excellent briefs. In addition, the parties submitted extremely helpful, comprehensive oral argument binders. Without dumping everything imaginable on the Court, the parties provided almost everything needed to decide the case. Working with counsel has been a pleasure.

## II.

### A. *Colunga* Complaint

The underlying federal litigation precipitating this declaratory judgment case is *United States ex rel. Colunga v. Hercules, Inc.,* No. 89–C–954–J (D.Utah). Apparently, it is undisputed that at various times between October 1981 and December 1987, Katherine A. Colunga worked for Hercules alternatively in document control and as a quality control inspector. Colunga's responsibilities largely included reviewing bills or inspecting various missile components.

According to her complaint, Colunga discovered manufacturing defects and billing irregularities in connection with missile components delivered by Hercules to the United States in the 1980s. Colunga claimed that she brought to her supervisors' attention the problems she discovered. Her disclosures were "initially welcomed and encouraged by her immediate superiors." After she expressed concern that the problems were more extensive, however, her supervisors allegedly informed her "that it was not her job to concern herself with such issues and that she was not being paid to investigate such matters." When she refused to "go with the flow" and "look the other direction," as instructed, Colunga was transferred and reassigned to other work.

In addition to discovering many instances where Hercules' products did not meet its government contracts' specifications, Colunga supposedly uncovered a pattern of false or fraudulent billing. Eventually, Colunga was fired in retaliation for her whistle blowing. The large personal settlement with Colunga is not part of Hercules' current coverage claim.

Colunga's complaint, as mentioned, was brought under the federal False Claims

Act. As relator[2] for the United States, Colunga presented seven causes of action. Her first count involved allegations that Hercules billed for parts not delivered and double billed for other parts. Counts two through five claimed that Hercules provided various parts that did not conform to its government contracts' specifications. According to those counts, the parts were manufactured incorrectly or damaged during manufacture, but nevertheless they were delivered. The government eventually paid for the nonconforming parts.

In count 1, Colunga asked primarily for civil penalties. In addition, Colunga asked for more than $500,000 in damages suffered by the United States "by having remitted payment for numerous parts and products which it has not received." In counts 2, 3, 4 and 5, Colunga again asked for civil penalties. And on behalf of the United States, Colunga alleged that the Government sustained millions in "damages ... for the difference between the price paid and the market value of such nonconforming product, and/or the costs necessary to inspect, test, remedy, and or replace such nonconforming products." In her sixth and seventh causes of action, Colunga alleged that Hercules fired her to prevent her from investigating and disclosing further improprieties or contract discrepancies.

While the Colunga complaint referred to "damages," the complaint nowhere alleged property damage. Nor did the complaint, directly or indirectly, make a claim for payment because of property damage or breach of warranty. Potentially covered property damage allegedly entered the underlying factual picture only because in 1985, a Hercules rocket motor blew up, destroying a launch pad in Tullahoma, Tennessee, and in 1991 another explosion damaged a unique and valuable test stand during a prequalification motor (PQM) test. But as mentioned above and discussed below, no one has demanded that Hercules pay for the launch pad or for the test stand or for any other property damage. As also discussed below, the launch pad and test stand damage first came into the case only when the trial court in *Colunga* allegedly ruled, at the last moment, that evidence concerning them could be introduced at trial.

### B. *Colunga* Trial Court's Rulings

The federal trial court held a hearing on February 27, 1998, and announced:

> The Court has ruled and continues to rule and will not reconsider its ruling, that this is a False Claims Act case. It is not a breach of contract case .... This is not a case in which plaintiffs have alleged breach of contract and it will not be decided by breach of contract principles or legal rules. I can't seem to communicate that adequately. I hope I am now.

The federal trial court further held:

> I see this case simply, at least in its legal issues, as simply one where the plaintiffs are alleging that this contractor made claims for services which the contractor did not perform or did not substantially perform. That is it .... That forms the entire basis of the case.

The notion that Colunga, individually or as relator, could seek money for property damage was not a possibility. By the same token, the federal court never considered the case as involving breach of warranty. The only misrepresentations that were in issue concerned Hercules' false claims to the government "as to work performed." The federal court was adamant

**2.** 31 U.S.C. § 3730(b).

that Hercules was facing trial only for false claims.

Moreover, after February 27 the federal court held additional hearings on March 6, April 14, 16, 20, and May 5, 1998. The Tullahoma and PQM explosions' evidentiary use was raised repeatedly. Over and over again, the trial judge ruled that the explosions were admissible, if at all, only to prove that Hercules' fraud was material. Apparently, materiality was a triable issue because Hercules denied that any of its mistakes actually mattered. The federal court, however, unequivocally ruled that if it decided eventually that the explosions would come into evidence, "they may not come in for liability."

The federal court was openly sympathetic to Hercules' objection that the explosions' probative value would be outweighed by the risk of unfair prejudice to Hercules. In response to Hercules' protests, the federal court left open the distinct possibility that after further consideration, the explosions might not come in at all. The federal court never wavered, however, about its intention at least to limit the evidence's use. Because the settlement intervened, there was no final ruling on whether the explosions would be inadmissable or admissible for a limited purpose.

Hercules asserts that over the years, the *Colunga* action "evolved" into one for property damage. Perhaps it seemed that way to Hercules' trial attorneys as they tried and tried to convince the federal court to keep evidence about the Tullahoma and PQM explosions out of the *Colunga* trial. Nevertheless, as discussed in detail below, the pretrial evidentiary wrangling and the federal court's preliminary evidentiary rulings did not amount to a fundamental change in the claims against Hercules.

## C. *Colunga* Settlement

Colunga initially filed suit in October 1989 in the United States District Court for the District of Utah. She filed an amended complaint in July 1991 and a second amended complaint in April 1992. On May 15, 1998 Hercules announced that it had come to terms with Colunga. Hercules chose to characterize it as "an agreement to settle a nine-year legal battle concerning its former Aerospace business .... The settlement ... relates to a ... [ ]Whistle Blower[ ] lawsuit filed in 1989 under the Federal False Claims Act by Katherine A. Colunga."

In its preamble, the settlement agreement between Colunga and Hercules carefully preserves each sides' litigation stance. For its part, Hercules denies any wrongdoing, maintaining instead that adverse court rulings and the vigorous litigation of the case made "a full and final compromise settlement of all claims" desirable. The settlement agreement declares that "nothing in this Agreement constitutes an admission or may be used as an admission of wrongdoing or liability by Hercules." (In that regard, the Court observes that Colunga demanded $546 million prior to statutory trebling. Ultimately, she and the United States settled the fraud part of the suit for $26.36 million, which is less than 5% of Colunga's claim.)

The settlement agreement, in its section 2, releases Hercules:

> from any claim that the United States has or may have under the False Claims Act, ... the Program Fraud Civil Remedies Act, ... the Contract Disputes Act, ... or any statute creating causes of action for civil damages or civil penalties for submitting ... claims ... to the Government for the conduct alleged in the First through Fifth Cause of Action of her Second Amended Complaint ....

In its section 13, however, the settlement agreement provides:

> Hercules ... acknowledges that this agreement does not release Hercules from any claims for ... property damage or for consequential damages, if any, arising from the products/services delivered under the contracts referred to in the relator's Second Amended Complaint.

At the February 27, 1998 hearing mentioned above, the federal court characterized Hercules' defense:

> In has always struck me that [Hercules'] position is that [Colunga]—and I no doubt won't state this the way you would like it—generally it is to the effect that [Colunga's] allegations are nothing more than a collection of anecdotal stories that represent some sloppiness at lower levels of the quality assurance process, and when taken in their totality and understood in context they are a mere drop in the bucket.

In a way, Hercules is correct that the February 27 ruling left Hercules exposed to "extra-contractual" claims. As presented, the federal court emphatically rejected Hercules' insistence that it was defending a breach of contract case. The federal court unequivocally held that Colunga's complaint involved Hercules misrepresenting the work it did and its entitlement to payment. That sort of behavior, which is actionable under the federal False Claims Act, exposed Hercules to civil penalties.

### D. Insurers Notified

On May 13, 1998, two days before announcing the *Colunga* settlement, Hercules notified its insurers about Colunga and her lawsuit's existence. Specifically, Hercules caused the *Colunga* complaint to be transmitted to its insurers, with a letter additionally advising them:

> The relator, Katherine Colunga, recently has been permitted to pursue extra-contractual claims for breaches of representations and warranties in her action under the False claims Act and for wrongful discharge.

Like Hercules' settlement announcement, its transmittal made no reference to property damage.

Sometime after May 21, 1998, Hercules transmitted the settlement agreement to the insurers. On May 26, 1998, after Hercules had filed suit against the insurers in Delaware, an insurance company executive spoke with Hercules' counsel. The lawyer memorialized the conversation in a letter on May 27. The insurance company executive responded to the lawyer's letter on May 28. That response cannot be construed as anything but acknowledgment that "a tentative settlement" had been reached in *Colunga*. The insurers' representative refused to comment on the insurers' coverage obligations, much less opine on coverage. The letter plainly states that the insurer "has not had an opportunity to make a determination of coverage. Our decision on coverage will be forthcoming upon receipt and evaluation of the appropriate information."

The letter speaks for itself. Furthermore, Hercules' characterization of the insurance company executive's written response as an "admission" is troubling considering the fact that the letter memorialized a conversation with Hercules' counsel held after Hercules had filed suit against the insurers and while Hercules was waiting for a responsive pleading to its complaint.

### III.

### A. The Insurance Policies

The parties are large, sophisticated businesses. Hercules' insurance program was

extensive and complex. During the relevant times, Hercules' insurance was provided by various combinations of defendant insurance companies under several policies having attachment points stacked in layers. The insurance policies themselves are complicated. For the most part, however, the issues presented turn on relatively limited coverage provisions and exclusions.

Although the policies' coverage periods and their terms are not identical, the parties agree and the Court finds that the policies were substantially similar with inconsequential differences.[3] As part of their comprehensive briefing, the parties provided excellent charts comparing the policies' specific language. For present purposes, the Court will consider the representative policy analyzed by Hercules in its briefs.

That representative policy, redacted to eliminate immaterial references to personal injury coverage, begins with: COVERAGE A ... Property Damage Liability.

> The [Insurance] Company will pay all sums which the *Insured* shall become legally obligated to pay as damages because of ... *property damage* caused by an occurrence, if the ... *property damage* arises out of the *products* hazard ....

The representative policy's definitions include:

| | |
|---|---|
| Products hazard | means ... *property damage* arising out of *aircraft products* or reliance upon a representation or warranty made at any time with respect thereto, but only if the ... *property damage* occurs away from premises owned by or rented to the *Named Insured* and after physical possession of such products has been relinquished to others. |

| | |
|---|---|
| Property damage | means ... physical injury to or destruction of tangible property .... |
| Occurrence | means ... an accident ... which results in ... property damage neither expected nor intended from the standpoint of the *Insured.* |

The representative policy also has notice provisions:

> In the event of an occurrence ... written notice ... shall be given ... as soon as practicable.

> If claim is made or suit is brought against the *Insured,* the *Insured* shall immediately forward to the *Company* every demand, notice, summons or other process ....

The policy also provides that:

> The Insured shall not, except at its own cost, voluntarily make any payment, assume any obligation to incur any expense ....

Finally, the policy unambiguously excludes coverage for damage to the missiles themselves. The so-called "missile" exclusion applies:

> to property damage to any missile ... arising out of such missile ... or any part thereof [.]

The parties clash over the missile exclusion's breadth. Hercules contends that the missile exclusion only applies to the loss of Hercules' parts incorporated into a damaged missile. Otherwise, Hercules contends that the policy covered damage to missiles and damage to other property caused by Hercules.

The missile exclusion is more comprehensive than Hercules suggests. The missile exclusion, however, is not pertinent. As discussed below, the *Colunga* litigation did not expose Hercules to payment be-

---

**3.** *See ABB Flakt, Inc. v. National Union Fire* *Ins. Co.,* Del.Supr., 731 A.2d 811, 814 (1999).

cause of property damage to the missiles, or otherwise.

## IV.

 The standards for interpreting insurance contracts are well settled and need little elaboration.[4] A contract is not ambiguous because the parties disagree regarding its proper construction. "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[5] Unless an insurance provision is ambiguous, the courts will apply its terms, as a matter of law. In this case, the parties disagree about the proper construction of the policies. Even so, the Court does not consider the policies as ambiguous and more importantly, at least where property damage caused by an occurrence is at issue, the Court is siding with Hercules in effect.

To the extent that the case's facts are not in dispute and the insurance policies are not ambiguous, the Court will decide coverage issues through a motion to dismiss or a motion for summary judgment under Superior Court Civil Rule 8(f) or 56, respectively. Because the Court must look to supplemental, factual pleadings in order to decide the late notice issue, Rule 56 patently applies. Which standard applies to the polices' coverage issue is less clear because this case springs from another case and the relationship between the cases blurs the line between Rules 8(f) and 56.

In order to decide whether the policies respond to the settlement, the Court has reviewed the *Colunga* rulings submitted by Hercules. (Presumably, Hercules supplied everything favorable to its position.) On the one hand, Hercules generally refers to and relies on those rulings in its complaint, so it could be said that the Court only is considering the pleadings. That view makes applying the dismissal standards appropriate. On the other hand, the Court has compared the rulings' particulars with facts presented in Hercules' supplemental pleadings. That supports treating the motions under summary judgment standards. In that context, however, the movants seemingly have intentionally limited their factual submissions in order to leave the case open to dismissal.

Because Hercules favors the summary judgment standard of review and even under that standard Hercules cannot prevail, the Court is not splitting hairs. The Court is treating the insurers' dispositive motions as motions for summary judgment.

As mentioned, Hercules supplemented the record with factual allegations. Usually, that is enough to create material disputes of fact and, thereby fend off summary judgment. To the extent that there are material disputes of fact, the Court must resolve those disputes, for present purposes, in favor of the non-moving party.[6]

The Court, however, is not required to accept the non-moving party's conclusory allegations.[7] So, for example, the Court accepts Hercules' assertion that it settled

---

**4.** *Id.* at 816. *See also Rhone–Poulenc Basic Chemicals v. American Motorists Ins. Co.,* Del. Supr., 616 A.2d 1192, 1196 (1992), *cited in Hercules, Inc. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. Nos. 92C–10–105 and 90C–FE–195, Silverman, J. (Jan. 14, 1998).

**5.** *Rhone–Poulenc,* 616 A.2d at 1196.

**6.** *Merrill v. Crothall–American, Inc.,* Del. Supr., 606 A.2d 96, 99–100 (1992).

**7.** *See Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 (1988).

with Colunga because under its view of the federal court's rulings Hercules stood to be held liable for damage caused by the Tullahoma and PQM explosions and for breach of warranty. As discussed below, however, based on the *Colunga* complaint, the federal court's rulings and the *Colunga* settlement agreement, the Court is satisfied that: Hercules was not answerable for property damage or breach of warranty, Hercules' concerns about the federal court's evidentiary rulings are immaterial and besides, Hercules' concerns were unreasonable as a matter of law.

### V.

The Court finds, as a matter of law and based on undisputed facts, that the settlement with Colunga, individually and on behalf of the United States, did not involve accidental property damage caused by an occurrence arising out of the products hazard. The settlement also did not involve payment for breach of warranty. The *Colunga* settlement is not covered by insurance.

Although the Court will explain it in detail, the Court's coverage holding can be summarized relatively quickly: The Court agrees with Hercules that, for present purposes, the Tullahoma and PQM explosions involved property damage caused by an occurrence arising out of the products hazard. And Hercules is entitled to coverage for all sums that Hercules paid because of that property damage. The court concludes, however, that Hercules' settlement with Colunga did not include any payment for property damage. The court appreciates Hercules' argument that its settlement included sums because of property damage. Hercules' argument is confounded, even under the generous summary judgment standard, because the *Colunga* complaint, the *Colunga* trial court's rulings and the *Colunga* settlement lead to the inescapable conclusion that Hercules did not pay any sum because of property damage. This is so, despite Hercules' factual contentions to the contrary.

### A. No Sum Paid Because of Property Damage

■ First, as presented above, Colunga's claim under the federal False Claims Act was not a claim for property damage. The Court recognizes, consistent with Hercules' argument, that Colunga's complaint made reference to damages. But that only related to differences between the value of the parts called for by the contracts and the parts as they were delivered. Colunga nowhere alleges that Hercules must pay anything because of property damage.

The Court further appreciates Hercules' argument that had Colunga's complaint gone to trial, Colunga might have introduced evidence concerning consequential property damage. Hercules, however, has not established that the evidence would have been admitted. Hercules recognizes, as it must, that the federal court's evidentiary rulings were a work in progress when the case settled. And because the federal court never made a final ruling, any contentions about the evidence's admissibility are speculative.

Moreover, as presented above, even if Hercules somehow could establish that the evidence would have been admitted at trial, its introduction would not have been for the purpose of increasing Colunga's damages. The federal court's position about that was consistent and clarion. When the case settled, the federal court was still trying to decide how the evidence could be admitted without exposing Hercules to an unacceptable risk of unfair prejudice. Hercules' implicit and unreasonable concern that the evidence about Tullahoma and PQM might have been admitted for one purpose and used improperly by the

federal jury in Utah does not generate an issue for another jury's consideration here.

■ Furthermore, no matter how earnestly Hercules believed that it might have been held liable indirectly for consequential property damage, its belief is immaterial. It does not establish insurance coverage where there is none. The *Colunga* complaint and the federal court's evidentiary rulings define Hercules' potential liability, which in turn establishes whether the insurance policies respond. As to those inherently legal matters, the Court is not bound by Hercules' claims and conclusions. Hercules' assessment of its potential liability becomes pertinent, as discussed below, only after Hercules establishes that a covered claim is involved.

The *Colunga* litigation, at bottom, did not involve property damage or breach of warranty. It also did not involve civil penalties imposed because of property damage. Primarily, it involved claims for civil penalties due to fraud against the United States and compensation for Colunga's retaliatory discharge. The federal court could not have been more emphatic as it hoped, apparently in vain, that it had made it clear that "this is a False Claims Act case."

\* \* \* \* \*

The insurers also correctly emphasize the fact that the *Colunga* settlement agreement itself excludes property damage claims. In that regard, at different points Hercules offers slightly different explanations for the settlement's property damage exclusion. Hercules argues in its briefs that the exclusion:

> [W]as intended only to exclude claims for property . . . damage resulting from products that did not meet specifications, but was not intended to exclude FCA claims . . . relating to property damage resulting from failure to follow

quality control procedures or misrepresentations by Hercules.

In trying to differentiate between providing nonconforming products and failing to follow quality control procedures, Hercules at best is drawing a distinction without a difference. Otherwise, Hercules is arguing perversely that its settlements' releases were less comprehensive. The argument that Hercules settled the *Colunga* false claims suit excluding claims arising from nonconforming products, but not excluding claims arising from misrepresentations, is not supported by the settlement agreement's language and it simply makes no sense. In his affidavit, Hercules' trial counsel states that the exclusion:

> [W]as intended to exclude . . . any future contract or warranty claims for . . . damage resulting from products already delivered . . . that later were determined not to have met specification. It was not intended to exclude FCA claims (such as Colunga's) relating to property damage allegedly resulting from misrepresentations by Hercules.

That contention makes even less sense.

At oral argument, Hercules further asserted, "[T]he fact that a release does not include something that might have been in the case doesn't tell you [that property damage] wasn't in the case." In other words, even if Hercules failed to obtain a complete release for property damage claims, that does not mean that it did not pay because of property damage. As a matter of business practice, law and plain common sense, it is hard to see why a corporation like Hercules would pay a multimillion dollar claim and not obtain a full release for it. Even so, Hercules' position is possible in theory. But the settlement excludes property damage and Hercules presents no evidence proving that it had a bona fide reason to pay because of property damage, with or without a release. If

Hercules thought that it was paying because of property damage, under the circumstances present here the insurers are not contractually obligated to reimburse Hercules. Just as Hercules is trying to prove, *ipse dixit*, that the federal False Claims Act case was something that it was not, Hercules is trying to prove, *ipse dixit*, that its settlement agreement also was something that it was not.

In a neutral light it seems likely that Hercules settled in order to cap its losses and finally make Colunga go away once and for all, taking her vexatious fraud and wrongful termination claims with her. The idea that the settlement was covered by insurance seems to have come at the last moment, perhaps in April 1998. In any event, viewing the record in the light most favorable to Hercules, a Delaware jury would not be justified in concluding, even in the face of Hercules' lawyers' and experts' testimony to the contrary, that the *Colunga* settlement involved covered property damages. To be clear, the Court is not making that finding based on surmise or credibility determinations, which are impermissible at this stage. The Court accepts Hercules' affiants' sincerity. The Court's ruling is made as a matter of law based on facts that are material and undisputed.

\* \* \* \* \*

Hercules' strongest legal support for its property damage argument comes from a Wisconsin intermediate appellate court. *Valley Bancorporation*[8] is a coverage case where the trial court had to look beyond the underlying complaint in order to determine whether it involved covered claims. The underlying complaint in *Valley Bancorporation* alleged misconduct by a bank, including mismanagement of a loan program and breach of the duty of good faith and fair dealing. The underlying complaint did not allege libel and slander, not in those precise words. A jury found for the underlying plaintiff, awarding compensatory and punitive damages. The bank then sued its insurers to obtain coverage. Eventually, the trial court "determined that a claim of libel and slander was made in the complaint." The trial court "also found that the evidence of libel and slander was so intertwined with the claim of bad faith so as to provide coverage ...."[9]

In *Valley Bancorporation*, the intermediate appellate court could not determine with certainty what facts were relied upon by the jury in making its determinations.[10] Therefore, *Valley Bancorporation* put the burden for resolving coverage issues on the insurer and concluded that the insurer had not met its burden. Because the bank's insurance policies covered libel and slander, because a bank official made defamatory telephone calls concerning the underlying plaintiff, and because bad faith was at the heart of the complaint, the intermediate appellate court agreed with the trial court that libel and slander were in the case and it assumed that the jury's verdict on bad faith and punitive damages took into account the bank's defamatory conduct.

Hercules analogizes to *Valley Bancorporation*, arguing that any damage award to Colunga would have taken into consideration the property damage caused by exploding missiles. In that way, according to Hercules, it was being held accountable financially for covered property damage, just like the bank was held accountable for libel and slander despite the wording of

8. *Valley Bancorporation v. Auto Owners Ins. Co.*, App., 212 Wis.2d 609, 569 N.W.2d 345 (1997).

9. *Id.* at 348.

10. *Id.* at 349.

the complaint against the bank. Hercules, in effect, contends that under *Valley Bancorporation* the insurers here must refute Hercules' assertion that its settlement, which incidentally Hercules crafted without the insurers' participation, did not take covered property damage into account. Otherwise, Hercules is entitled to summary judgment or, at least, to have a jury untangle the settlement, with the burden of proof on the insurers.

In its own context, *Valley Bancorporation* makes sense. Moreover, *Valley Bancorporation* is helpful in two related ways. First, *Valley Bancorporation* focuses on the initial step in deciding coverage questions, namely whether a potentially covered claim was made against the insured. In most coverage cases there is no dispute about that initial inquiry. *Valley Bancorporation* holds that the words chosen by the underlying plaintiff in the underlying complaint do not necessarily control the Court's coverage decision. In determining whether there is coverage, the Court must identify the underlying litigation's essence and compare that with the insurance policy's coverage provisions. *Valley Bancorporation* also holds that where the insured has paid sums in connection with underlying litigation and that litigation's nature is unclear, the insurance company bears the burden of disproving that the payment was for a potentially covered claim. That final holding is not in issue here because, as discussed elsewhere, the *Colunga* claim is clear.

*Valley Bancorporation* is distinguishable in three ways. First, as mentioned, the *Valley Bancorporation* trial court specifically found that the complaint against the insured essentially was for a covered occurrence, libel and slander. That threshold determination is critical. In contrast, the *Colunga* complaint does not allege a covered occurrence, directly or

indirectly. There was no direct or indirect claim by Colunga that a nonconforming part damaged any property. In starkest contrast to the trial court's finding in *Valley Bancorporation*, the *Colunga* trial court ruled repeatedly that *Colunga* "is a False Claims Act case."

In further contrast to *Valley Bancorporation*, where the Wisconsin courts could not unscramble the eggs after trial, the *Colunga* court intended to ensure from the trial's outset that evidence about property damage would not be used improperly by the jury to enhance the damages. Furthermore, as the insurance companies and the Court repeatedly emphasize, the *Colunga* settlement expressly excluded property damage claims. Thanks to Colunga's cleanly drafted complaint, the federal court's insistence and the settlement agreement's exclusion, the Court here can easily characterize Colunga's claim and conclude that it did not involve a covered claim.

The Court mentions here that the *Colunga* trial court's and this Court's characterization of the underlying litigation and the property settlement's terms make not only *Valley Bancorporation* inapplicable to this case, but they undercut most other coverage authorities. Many of the underlying claims in Hercules' other legal precedents clearly involved property damage allegations and, in most cases, findings by the trial courts to that effect. One of those cases, discussed and cited below, is *United States Gypsum Co. v. Admiral Insurance Co.*

Finally, this case is distinguishable analytically from *Valley Bancorporation* in the sense that the relationship between the property damage in this case and the federal False Claims Act is not the same as the relationship between defamation and the bad faith claim in *Valley Bancorpora-*

*tion.* In other words, *Valley Bancorporation* and this case are not analogous.

While Hercules vigorously argues that it settled with Colunga only after learning that Colunga would be allowed to present "extra-contractual" claims and also to present evidence concerning property damage, the "extra-contractual" claims did not concern property damage and Hercules agreed to the settlement excluding property damage. Hercules' reaction to, and its assessment of the trial court's evidentiary rulings do not convert the *Colunga* fraud complaint and the *Colunga* settlement into a property damage claim and a payment for property damage. Regardless of the trial court's evidentiary rulings and Hercules' reaction to them, the essential nature of the claims against Hercules and, therefore, the purpose of its payment remained the same.

■ Hercules' arguments and its products liability law precedents break down, in part, because of the fundamental difference between products liability and negligence on the one hand and the federal False Claims Act on the other hand. The federal False Claims Act is not aimed at breach of contract or property damage. Like *Colunga* holds, to recover under the Act it is not even necessary to establish any damage. The Act carries its own penalty provisions. The Act is not a negligence or products liability law variant. The Act is about fraud against the government.

The fact, if it is a fact, that Hercules' misconduct not only took advantage of the government, but also resulted incidently in off-site property damage does not give Hercules entitlement to insurance coverage. Hercules almost agrees that if the alleged fraud had not caused property damage Hercules would not be covered for mere civil penalties. Hercules seemingly contends, paradoxically, that the occurrence of property damage enhanced its otherwise non-covered settlement payment and because of that the insurers should pay. The Court does not agree that there was any damage enhancement; Hercules' argument is tenuous and subjective. But even if there were damage enhancement it would not convert a federal False Claims Act settlement into a property damage payment.

\* \* \* \* \*

Hercules posits a two-part legal analysis for determining coverage for an underlying settlement:

> The proper inquiry regarding coverage for an underlying settlement is ... what actually was alleged against the policyholder, and what allegations motivated the policyholder's reasonable decision to settle.

Hercules concludes that it "need not prove the actual existence of liability in the underlying litigation, but only that it had a reasonable anticipation of liability for covered allegations."

In terms of Hercules' first legal test, as already discussed, the Court has found that Colunga never actually alleged property damage. Nor was Hercules required to pay Colunga because of property damage. Even under Hercules' legal framework, those findings largely dispose of Hercules' coverage claim. Nevertheless, Hercules' secondary emphasis on its own motivations also misses its own mark.

To establish its motivations' legal importance, Hercules relies heavily on *United States Gypsum Co. v. Admiral Insurance Co.,*[11] mentioned above. Hercules' reliance

---

11. *United States Gypsum Co. v. Admiral Ins. Co.,* 268 Ill.App.3d 598, 205 Ill.Dec. 619, 643 N.E.2d 1226 (1995).

on *Gypsum* illustrates the importance of subtle distinctions in coverage matters. *Gypsum* may look helpful to Hercules, but it is not.

In the 1970s, United States Gypsum faced hundreds of claims concerning asbestos laden building materials that it began installing decades before. There was no controversy about whether the underlying claimants alleged that USG caused property damage. They certainly did. The pivotal issue in the cases against USG was whether its products actually caused the alleged property damage. The litigation against USG took years, with extensive discovery. The underlying claimants produced experts who opined that USG products left asbestos everywhere. In some instances USG stood trial and lost or settled during trial. In seven cases USG settled before trial.

The underlying cases in *United States Gypsum* "sought to recover from Gypsum both the cost of removing [asbestos containing building materials] ... and the cost of repairing the damage which the material caused." [12] In other words, there was no doubt in *United States Gypsum* about whether the underlying plaintiffs made claims that, if proved, would trigger coverage. The underlying litigation and the coverage trials all turned largely on whether the underlying plaintiffs' property damage claims were born out by the evidence, or for the settled cases, by the potential evidence.

*United States Gypsum* and its precedents establish the means by which the record in an underlying property damage case will be analyzed in subsequent coverage litigation. In that regard, and in that regard only, *United States Gypsum* explains that the insured cannot be put in the "untenable position" of fending off liability in the underlying action "and then having to turn around and prove the exact opposite position in the coverage action." [13] *United States Gypsum* holds that, where an underlying settlement is involved, the policyholder must prove that it settled "an otherwise covered loss" in a reasonable amount taking into consideration the possible recovery and the likelihood of the claimant's success against the insured. In meeting its burden of proving its potential liability, the insured can rely on facts known to it. The personal or subjective test for potential liability kicks in, however, only when the insured is facing liability for an "otherwise covered loss." [14]

If Colunga, on behalf of the United States, had demanded, directly or indirectly, that Hercules pay because of damage to the launch pad and test stand, that would be a covered claim. In order to prove then that it was potentially liable to Colunga and that its settlement was reasonable, Hercules would not have had to admit that it actually caused property damage. To explain its settlement and justify reimbursement for the otherwise covered claim, Hercules could have invoked *United States Gypsum*, sworn to its concerns, their factual basis and, perhaps, it might have thwarted summary judgment without admitting actual liability. But as presented above, Colunga accused Hercules of bilking the United States through systematic contract fraud. Accordingly, to benefit from *United States Gypsum*'s holding, Hercules would have to establish that the insurance policies cover contract fraud claims, or the like. Then, Hercules could continue to deny fraud, but still advance its concerns about potential liability and defeat a dispositive motion. In this re-

**12.** *Id.* 205 Ill.Dec. 619, 643 N.E.2d at 1230.

**13.** *Id.* 205 Ill.Dec. 619, 643 N.E.2d at 1238.

**14.** *Id.* 205 Ill.Dec. 619, 643 N.E.2d at 1244.

gard, the Court reiterates its earlier conclusion that the policies unambiguously do not cover civil penalties unless, perhaps, they were imposed because of property damage. Again, Hercules' payment cannot be attributed to property damage in any financially recognizable way.

To be certain that it fully understands Hercules' position, the Court asked Hercules to submit jury instructions. With respect to coverage for property damage, Hercules' proposed instructions make clear that Hercules expects coverage if it settled with Colunga simply because it was "concerned" that it "could" be held liable for property damage, provided that its concern merely was reasonable. The Court holds that Hercules' concerns, reasonable or otherwise, are immaterial for the purpose of determining its potential insurance coverage in the first place. Moreover, if Hercules' concerns were in issue, the Court is satisfied that, viewed in the light most favorable to Hercules, the record would not support a jury's finding that Hercules' concerns were reasonable. The only way a Delaware jury could find for Hercules would be if it improperly speculated that the federal court did not mean what it said or that the explosion evidence would have been admitted and the federal jury then would have disregarded the cautionary instruction that the federal court said it would give.

### B. No Breach of Warranty

■ Hercules claims that the policies cover Colunga's alleged breaches of representations and warranties regarding Hercules' products. Specifically, in its amended complaint Hercules alleges:

> The allegations of property damage and breaches of Hercules' representations and warranties described in [the *Colunga* complaint] are within the coverage of the ... Policies ....

Actually, the *Colunga* complaint did not mention, much less allege, any breach of warranty. As for misrepresentations alleged by Colunga, they did not concern warranties in the way that Hercules suggests. The *Colunga* complaint concerned Hercules' false certifications about the work it did and its false claims for payment. The federal court was clear that the *Colunga* trial would be about Colunga's allegations that Hercules misrepresented the quantity and quality of its work and that it padded its bills. As discussed above, Hercules itself alleges that as of February 27, 1998, the *Colunga* litigation indisputably centered on "extra-contractual" claims.

■ Hercules not only mischaracterizes the nature of Colunga's misrepresentation claims, it also misconstrues the policies' scope of coverage. Hercules attempts to read warranty coverage into the policies through the products hazard, simply because it refers to "reliance upon a representation or warranty." The policies, however, respond only when sums are paid because of property damage. To be sure, the insurance covered more than property damage caused by Hercules' negligence. It also may have provided coverage if someone's reliance on Hercules' representations resulted in property damage for which Hercules had to pay. The threshold requirement for coverage in either situation, however, was property damage. The Court has determined that Hercules' settlement did not pay for property damage at all. Therefore, the representations and warranty language in the products hazard does not matter.

Hercules goes farther. It argues that some policies "provide coverage for representations and warranty claims even when property is not physically injured." That argument is based on the fact that policies issued after 1988 included impaired prop-

erty exclusions, which confirm that the policies do not cover liability arising out of property that is rendered less useful because of defects. Hercules asks the Court to infer from the exclusions' later addition that pre–1988 policies covered all misrepresentations and breaches of warranty.

In this case, the impaired property exclusion's addition does not strengthen Hercules' position much. Hercules did not settle with Colunga over impaired property. In addition, with or without the impaired policy exclusion in the policy, the only way the products hazard's definition makes sense is if it concerns property damage caused by Hercules' representation or warranty that its parts would work. The products hazard does not involve naked representation by Hercules that it was entitled to payment under its contracts. The policies unambiguously cover the risk that Hercules would pay for property damage caused by Hercules' products or its representations about them. The policies do not cover the risk that Hercules might make actionable false claims to the government about Hercules' work, its products' quality, and its entitlement to payment.

Finally as to its warranty argument, Hercules' proposed jury instructions are even more far-fetched than its property damage instructions. Hercules expects the Court to instruct the jury: "In addition to coverage ... for damages because of property damages, ... the Policies also provide[ ] coverage for ... liability arising out of the 'Products Hazard,' whether or not Hercules is liable for any damages because of property damage." As discussed above, that instruction rewrites the policies, greatly expanding their coverage.

* * * * *

The Court is not resting its coverage holding on Defendants' lead case, *New Memorial Associates v. Credit General Insurance Corp.*[15] First, that case is not authoritative. Second, despite some significant similarities to this case, *New Memorial Associates* is not on point. *New Memorial Associates*, however, is an insurance coverage case that actually arose out of an underlying federal False Claims Act complaint. Although the United States Magistrate Judge's decision is not explicit, it appears that the Government conducted the action there. In the underlying action here, the Government declined to take over and Colunga obtained the final settlement.[16]

More importantly, the United States Magistrate Judge decided *New Memorial Associates* "leaving aside" the issue as to whether property damage occurred. Instead, *New Memorial Associates* holds that there was no occurrence because there was no accident: "[The] complaint sought damages for intentional conduct rather than an accident." While this case is a federal False Claims Act case and it also does not involve payment because of a covered accident, this case and *New Memorial Associates* otherwise are dissimilar.

*New Memorial Associates* is helpful, albeit marginally, in two ways. First, it rejects the underlying defendant's "attempt [ ] to cast the complaint in terms contrary to the plain terms of the allegations therein."[17] That is what is going on in this case. Second, *New Memorial Associates* and this Court are focusing in different ways on the nature of a federal False Acts Claim case. For different rea-

---

**15.** *New Mem'l Assocs. v. Credit Gen. Ins. Corp.*, D.N.M., 973 F.Supp. 1027, 1030–1031 (1997).

**16.** 31 U.S.C. § 3731(b)(4).

**17.** 973 F.Supp. at 1031.

sons, the court in *New Memorial Associates* and this Court apprehend similar, fundamental differences between federal False Claims Act violations and alleged negligence or products liability claims.

Although not directly on point, a recent Delaware authority, *ABB Flakt, Inc. v. National Union Fire Insurance Co.,*[18] is very helpful. Flakt was sued for patent infringement. In turn, Flakt sued for coverage through an "advertising injury" clause in its general liability insurance policies. This Court granted summary judgment in favor of the insurers. Much as the Court has done here, *ABB Flakt* compared the underlying claim with the insurance coverage provisions. *ABB Flakt* holds that Flakt failed to establish "the required causal connection between the alleged 'advertising injury' and the 'advertising activities' of Flakt."[19] While *ABB Flakt* is not a perfect analogy, it lends support to the Court's approach here and to the Court's conclusion that any property damage caused by Hercules was not a significant part of *Colunga.*

\* \* \* \* \*

Reduced to its essence, the decision here turns on the conclusion that Hercules is rationalizing its claim for coverage. As discussed above, the underlying complaint here, in form and substance, was not grounded in tort, contract or products liability law. The federal trial court clearly articulated Hercules' potential liability and the settlement agreement expressly excluded property damage. While the Court here is not bound by the way Colunga fashioned her complaint, there is a point beyond which Hercules cannot subjectively rematerialize its potential liability. As already stated, the Court is satisfied that despite its references in the alternative to other damages, the *Colunga* complaint and the *Colunga* settlement cannot be said to include payments to the Government, through Colunga, because of property damage accidentally caused by Hercules or for breach of warranty.

## VI.

### A. No Notice

 As presented above, the insurance policies also require as a condition precedent to coverage that not only must Hercules notify insurers about any "occurrence ... as soon as practical," Hercules must "immediately forward to the [Insurance] Company every demand, notice, summons or other process received by [Hercules]." Hercules will not concede that its notice to the insurers was late. It crafts an argument invoking another traditional summary judgment killer, reasonableness. But there is no material dispute that it missed the policies' immediate notification deadline by about nine years. As a matter of law, Hercules' delay clearly violated the policies' immediate notice requirement.

### B. Prejudice

 Hercules also argues vigorously that the insurers have failed to demonstrate that Hercules' unjustified delay in providing notice actually caused prejudice to the insurers. It is settled in Delaware that before coverage is forfeited due to failure to notify, the insurer must establish prejudice. Hercules continues by making the point that prejudice cannot be based merely upon the passage of time. In passing, Hercules argues that the insurers passed up their "opportunity to intervene" in the settlement process after receiving notice. And Hercules then cautions the

18. *ABB Flakt, Inc. v. National Union Fire Ins. Co.,* Del.Supr., 731 A.2d 811 (1999).

19. *Id.* at 817.

Court that "prejudice is an inherently factual inquiry." Hercules therefore concludes that it is entitled to go to the jury on the prejudice issue.

The Court initially observes that by the time Hercules gave the insurers any "opportunity to intervene" in the *Colunga* litigation, not only had Hercules announced the *Colunga* settlement, Hercules already had filed suit against the insurers. Under the circumstances, the idea that the insurers had a fair "opportunity to intervene" is wishful thinking, at best. Further, any suggestion by Hercules that the insurers sat on their hands is similarly misguided. Moreover, as discussed below, by the time it notified the insurers Hercules had spent considerable sums on its defense. And it remains to be seen whether the insurers must prove prejudice to defeat a claim for reimbursement where the policies prohibit payment by the insured.

In any event, at this point the Court will not grant summary judgment on the prejudice aspect of the notice requirement. Frankly, the Court's caution is questionable. If ever there were a case that invites a finding of inherent prejudice as a matter of law, this might be the one. Taking Hercules' current position at face value, there was no truth to the *Colunga* complaint. According to Hercules, its settlement involved extra-contractual claims and unfavorable evidentiary rulings. Nevertheless despite its promise not to pay any sums, Hercules paid $55,000,000, most of which it insists must now be repaid by insurance companies that did not agree to any payment.

The Court's previous determination that there is no coverage in the first place makes it unnecessary, however, to decide the prejudice issue as a matter of law. In passing, the Court observes that if Hercules' claims survived defendants' dispositive motions, the settlement agreement's terms and the magnitude of the attorneys' fees claims would factor into the Court's prejudice analysis. Further discovery would be appropriate. It could be, for example, that keeping the insurance companies out of the picture reduced the *Colunga* settlement.

## VII.

The Court finally observes that Hercules claims reimbursement for payment to Colunga's attorneys' and Hercules' own defense costs. The Court's holding here that Hercules is not entitled to reimbursement is subsumed within the Court's holding that Hercules does not have an insurance claim arising out of the *Colunga* settlement. To be clear, the Court understands that the duty to defend is considerably broader than the duty to pay claims. Even so, Hercules did not ask for a defense and, considering the *Colunga* complaint, no defense by the insurers was required in the first place.

The *Colunga* complaint did not allege property damage or anything amounting to an occurrence. In its own arguments on property damage, Hercules in effect admits that, by its own reckoning, property damage did not enter the *Colunga* litigation until February 27, 1998, only months before settlement.

Assuming that Hercules promptly had demanded that the insurers defend the *Colunga* action in 1989, which it clearly was required to do and which it clearly did not, the Court cannot see the basis upon which the defense would have been requested, other than the fact that Hercules had been sued. And considering the *Colunga* complaint, the Court does not know on what basis the insurers could have been ordered to provide a defense at that point.

Even if Hercules had demanded a defense immediately after February 27, 1998, the record would not have justified requir-

ing the insurers to provide one. As discussed exhaustively above, at that point the federal court already was on record as to the narrow nature of Colunga's complaint. Accepting its position at face value, at the most Hercules might suggest that the possibility of coverage arose when Colunga started discovery on the explosions. Hercules, however, did not ask for a defense then and it is an unrealistic stretch to conclude that the duty to defend arose during pretrial motion practice in the litigation of an otherwise non-covered claim.

## VIII.

For the foregoing reasons, the Court is satisfied as a matter of law that Hercules' settlement of the federal False Claims Act complaint against Hercules does not fall within the coverage provided by any insurance policy at issue here. Defendant's motion to strike is **DENIED**. Hercules' motion for partial summary judgment is **DENIED**. Defendants' alternative motions for summary judgment are **GRANTED**.

**IT IS SO ORDERED.**